UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| SANTOS TREJO, | § | |
| ANGELA TREJO, | § | |
| EFRAIN TREJO, | § | |
| YANETH TREJO, | § | |
| ISMAEL MARTINEZ-GONZALEZ, | § | |
| JUAN GUZMAN, | § | |
| ELEAZAR GARCIA-MATA, and | § | CIVIL ACTION NO. 3:14-cv-161 |
| ESTEBAN ALFARO-HUITRON, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | |
| | § | |
| WKI OUTSOURCING SOLUTIONS, LLC, | § | |
| JAIME CAMPOS, | § | |
| SKYLINE PRODUCE, LLC, and | § | JURY TRIAL DEMANDED |
| LACK FARMS, INC., | § | |
| | § | |
| **Defendants.** | § | |

PLAINTIFFS' ORIGINAL COMPLAINT

## I.   INTRODUCTION

Eight U.S. agricultural workers bring this action against two chile and onion growers in southern New Mexico and their Texas-based labor contractor and its president.  The U.S. workers claim that the growers and their agents hired them in April and May 2012 to work from June 1 until mid-August 2012.  Then suddenly the businesses canceled the work, attributing cancelation to a longstanding drought.  Plaintiffs claim that the real reason that the businesses canceled the work was because too many U.S. workers attempted to accept the employment, which would have precluded the businesses from importing the foreign guestworkers whom they really sought to employ under the federal H-2A program.  The Grower Defendants hired other farmworkers that summer, working with the same farm labor contractors that they had worked

with in years past.  Plaintiffs wasted time and effort in preparing to work for Defendants, and were left to scramble to find other jobs after Defendants reneged on their offer of employment. Hence this lawsuit.

## II.  JURISDICTION

2.1     This court has jurisdiction over this action pursuant to:

        a)     28 U.S.C. § 1331 (Federal Question);

        b)     29 U.S.C. § 1854(a) (Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §§ 1801, *et seq.*); and

        c)     28 U.S.C. § 1367 (Supplemental Jurisdiction).

2.2     The Court has the power to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## III.  VENUE

3.1     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district, or a substantial part of property that is the subject of the action is situated in this district.

3.2     Venue is also proper pursuant to 29 U.S.C. § 1854.

## IV.  PARTIES

4.1     The eight individual Plaintiffs—SANTOS TREJO, ANGELA TRAJO, EFRAIN TREJO, YANETH TREJO (collectively, "the Trejo family"), ISMAEL MARTINEZ-GONZALEZ, JUAN GUZMAN, ELEAZAR GARCIA-MATA, and ESTEBAN ALFARO-HUITRON (collectively, "the El Paso Plaintiffs")—are farmworkers.  The El Paso Plaintiffs have their permanent place of residence is in El Paso County, Texas.  The Trejo family has its permanent place of residence in Hidalgo County, Texas.

4.2     Defendant WKI OUTSOURCING SOLUTIONS, LLC ("WKI") is a Texas limited liability company doing business and with its corporate headquarters in El Paso, Texas. WKI may be served with process by serving its registered agent, Defendant JAIME CAMPOS, at 1401 Lomaland Drive, El Paso, TX 79935.

4.3     Defendant JAIME CAMPOS is the president, registered agent, and manager of Defendant WKI.

4.4     Defendant SKYLINE PRODUCE, LLC ("SKYLINE") is a New Mexico limited liability company doing business and with its corporate headquarters in Hatch, New Mexico. SKYLINE may be served with process by serving its registered agent, Marty D. Franzoy, at 7259 Highway 26, Hatch, NM 87937.

4.5     Defendant LACK FARMS, INC. ("LACK") is a New Mexico corporation doing business and with corporate headquarters in Rincon, New Mexico.  LACK may be served with process by serving its registered agent, Joe Paul Lack, Jr., at 5585 Kit Carson Road, Rincon, NM 87940.

## V.     STATEMENT OF FACTS

5.1     At all times relevant to this action, each of the following Defendants was an "agricultural employer" within the meaning of AWPA, 29 U.S.C. § 1802(2):

        a)     SKYLINE; and

        b)     LACK.

5.2     At all times relevant to this action, each and every Plaintiff was engaged in "agricultural employment" within the meaning of AWPA, 29 U.S.C. § 1802(3).

5.3     At all times relevant to this action, WKI and JAIME CAMPOS were "farm labor contractors" within the meaning of AWPA, 29 U.S.C. § 1802(7).

5.4     At all times relevant to this action, each and every Plaintiff was a "migrant agricultural worker" within the meaning of AWPA, 29 U.S.C. § 1802(8).

5.5     At all times relevant to this action, each and every Defendant was a "person" within the meaning of AWPA, 29 U.S.C. § 1802(9).

5.6     At all times relevant to this action, each and every Plaintiff was a "United States worker" or "U.S. worker" within the meaning of 20 C.F.R. § 655.103(b).

**A.  The H-2A Application Process and Requirements**

5.7     The Immigration and Nationality Act (INA) authorizes the nation's current agricultural guestworker program, called the H-2A program.  *See* 8 U.S.C. 1101(a)(15)(H)(ii)(a). This program allows alien workers to be admitted temporarily into the United States to perform agricultural labor if an insufficient number of U.S. workers[1] are able, willing, qualified, and available for the job at the time and place needed.

5.8     The H-2A program has two fundamental goals: (1) employ U.S. workers rather than aliens whenever possible; and (2) prevent foreign agricultural workers from adversely affecting the wages and working conditions of U.S. workers.  *See* 8 U.S.C. § 1188(a)(1)(A)-(B).

5.9     An employer wishing to employ foreign agricultural workers must first seek able, willing, qualified, and available U.S. workers both through the interstate clearance system operated by State Workforce Agencies (SWAs), and through independent positive recruitment efforts.

5.10    Employers who seek foreign guestworkers must first submit a job offer on form ETA-790, also known as a "clearance order."  They submit this form to the SWA serving the

---

[1] A "U.S. worker" is a citizen or national of the United States or an alien lawfully admitted for permanent residence in the United States.  20 C.F.R. § 655.103.

area of intended employment.  If the job opportunity is located in more than one state within the same area of intended employment, then the employer may submit a clearance order to any SWA with jurisdiction over the anticipated worksites.  20 C.F.R. § 655.130.

5.11    Clearance orders are job offers describing the terms and conditions of the job, including the following:

a)    An agreement to abide by the assurances required by 20 C.F.R. § 655.135;

b)    The length of the job opportunity;

c)    Certain minimum benefit, wage, and working-condition provisions including: housing, workers' compensation; employer-provided items; meals; transportation; a guarantee to provide three-quarters of the promised work; record-keeping; statements of hours and earnings; the frequency of pay; provisions regarding the abandonment of employment, termination for cause, and contract impossibility; a copy of the work contract; and information regarding deductions;

d)    A guarantee of the first week's wages for any worker referred through the clearance system or by farm labor contractors;

e)    An assurance that the wages and working conditions are not less than those among similarly-employed farmworkers in the area of intended employment; and

f)    An assurance by the employer that the clearance order contains all the material terms and conditions of the job.

5.12     Once the relevant SWA finds the clearance order to be acceptable, the SWA publishes the clearance order within and outside the state to recruit U.S. workers for the employer in the area of intended employment.  20 C.F.R. § 655.121(c).

5.13     During the SWA's and the employer's recruitment of U.S. workers, the employer must offer at least the same working conditions, including the same wage rate, to U.S. workers as it is offering to its prospective H-2A employees.  20 C.F.R. § 655.122(a).

5.14     After submitting the clearance order to the SWA, the employer files a temporary labor certification application with the U.S. Department of Labor's (DOL) Employment and Training Administration (ETA) National Processing Center in Chicago, along with a copy of the clearance order.  20 C.F.R. § 655.130(a), (b).

5.15     As part of the clearance order and the temporary labor certification application, an employer must agree to accept referrals of all qualified, available U.S. workers who apply during the first half of the contract period.  20 C.F.R. § 655.135(c).   Not only must the employer accept these referrals, it must provide employment if the workers are qualified and available.  *Id.* at (d). This is a continuing obligation throughout the first half of the contract period.

5.16     DOL decides whether to approve or deny the employer's temporary labor certification application based on the employer's representations and whether the employer has met the certification requirements, including the obligation to recruit U.S. workers.  *See* 8 U.S.C. § 1188(b)(4).

5.17     Before DOL can approve a temporary labor certification application, the employer must file a written recruitment report with the Certifying Officer at DOL in charge of the employer's application.  20 C.F.R. § 655.156(a).  The report must:

        a)      Identify all recruitment sources;

    b)      Identify all U.S. workers referred and the results of the referral;

    c)      Confirm that all former U.S. worker employees have been contacted and by which means; and

    d)      State the lawful, job-related reason for which any U.S. workers were not hired. *Id.*

5.18    While the procedures described above are somewhat involved, agricultural employers use the H-2A program because it benefits them in many practical ways, described next.  The H-2A guestworkers who receive visas to work in the United States are legally required to work for <u>only</u> one employer; they cannot leave their job without giving up their legal right to be present in the United States, even if their employer is violating U.S. employment laws or the H-2A regulations.  Furthermore, U.S. anti-discrimination laws do not apply beyond U.S. borders, allowing employers importing H-2A guestworkers to select their ideal workforce—usually young men willing to live away from their families, work long hours, perform difficult work, and accept low pay.  Lastly, employers are exempt from paying Social Security and unemployment taxes on H-2A workers' wages, which saves them money.  By contrast, U.S. workers are able to work for any employer they choose, allowing them to select the employer offering the best wages and conditions.  Additionally, U.S. workers are entitled to more job-related benefits, including protection by the AWPA, unemployment insurance, and employer contributions to their Social Security accounts.

**B.  Grower Defendants Hired WKI to Provide Them with Workers, and WKI Petitioned the Federal Government for Permission to Import Foreign Workers**

5.19    The large chile and onion industries in southern New Mexico have long used local agricultural labor to tend and harvest their crops.  The local agricultural labor supply has always met growers' demand for hand-harvest agricultural labor during the chile and onion seasons.

5.20    In late 2011, however, Defendant WKI contracted with four chile growers to import what would have been southern New Mexico's first group of foreign H-2A workers, as outlined in the related case of *Alfaro-Huitron, et al. v. WKI Outsourcing Solutions, LLC, et al.*, also filed in the Western District of Texas, El Paso Division.

5.21    WKI and the four chile growers were not successful in importing H-2A workers in late 2011.  WKI then contracted with the Grower Defendants in this case to attempt, once again, to import foreign H-2A guestworkers to work in onions and chile.

5.22    In or around March 2012, SKYLINE and LACK (collectively, "the Grower Defendants") signed "Agreements of Outsourcing Support" with WKI.  *See Exhibits 1-2, attached.*  The Grower Defendants and WKI agreed to the following terms:

a)    WKI would provide SKYLINE with 25 workers from June 1 to August 15, 2012 to work in green chiles and onions; and

b)    WKI would provide LACK with 60 workers from June 1 to August 15, 2012 to work in the onion harvest, and 60 workers again from October 1 to November 15, 2012 to work in the red chile harvest.

5.23    At all times relevant to this action, and in all WKI's actions and omissions set forth in this Complaint, WKI acted as an agent for one or more of the Grower Defendants, and acted within the scope of its agency.

5.24    In late March or early April, 2012, Defendant JAIME CAMPOS, acting in his capacity as President of WKI and as an agent for both of the Grower Defendants, submitted an original Clearance Order to DOL's ETA to request permission to bring in 85 foreign H-2A workers to work from June 1 to August 15, 2012 at SKYLINE and LACK, both in southern New Mexico.  *See Exhibit 3, attached.*

5.25    WKI requested these workers to "manually plant, cultivate, and harvest field crops such as green chile, red chile, onions, and other seasonal crops," according to the Clearance Order.

5.26    WKI wrote in the Clearance Order that the workers would live in a dormitory attached to the *Un Nuevo Pacto* church on the east side of El Paso, Texas between 87 and 94 miles from the worksites in southern New Mexico.  The housing was to be provided to the workers without charge.  *See id.*

5.27    WKI also promised in the Clearance Order to provide 35 hours of work per week, with a guarantee of three-quarters of the promised work, three meals a day for workers at a cost of $11.13 per person per day, a wage of $9.94 per hour, and free transportation between the housing site and the work sites.  *See id.*

**C.  The Grower Defendants, WKI, and JAIME CAMPOS Recruited and Hired Farmworkers, Including Plaintiffs ISMAEL MARTINEZ-GONZALEZ, ELEAZAR GARCIA-MATA, ESTEBAN ALFARO-HUITRON, and JUAN GUZMAN, in Person in El Paso, Texas**

5.28    In or around late April 2012, JAIME CAMPOS and an unknown number of assistants held one or more meetings at the Border Agricultural Workers' Center ("BAWC") near downtown El Paso, Texas in order to recruit, solicit, hire, employ, furnish, transport, and/or house farmworkers for employment on behalf of WKI.

5.29    Plaintiffs ISMAEL MARTINEZ-GONZALEZ, ELEAZAR GARCIA-MATA, and ESTEBAN ALFARO-HUITRON were each present at one or more of these meetings.

5.30    At all times relevant to this action, and in all Defendants' actions and omissions set forth in this Complaint, these assistants acted as agents for WKI, Campos, and the Grower Defendants, and acted within the scope of their agency.

5.31     On information and belief, at all times relevant to this Complaint, these assistants were not licensed by the U.S. Department of Labor to recruit migrant farmworkers.

5.32     At a meeting at the BAWC, JAIME CAMPOS or his assistant(s) described to the assembled farmworkers the basic details of the job offer contained in the Clearance Order. JAIME CAMPOS or his assistants also told a number of the El Paso Plaintiffs that the work was certain, that there was the possibility of up to five or six months of work, that tractor drivers would receive a higher hourly wage, and that workers would receive a bonus at the end of the season.

5.33     At a meeting at the BAWC, JAIME CAMPOS or his assistant(s) asked interested workers to sign up on a list.  Plaintiffs ELEAZAR GARCIA-MATA and ESTEBEN ALFARO-HUITRON wrote their names on this list.

5.34     Plaintiffs ISMAEL MARTINEZ-GONZALEZ and ELEAZAR GARCIA-MATA signed contracts provided by WKI agreeing to work for Defendants under the terms and for the consideration offered by WKI.

5.35     Plaintiff JUAN GUZMAN heard that Defendant JAIME CAMPOS had been to the BAWC to recruit farmworkers, and was given an address on Lomaland Avenue in El Paso to inquire about the job.  He first went to the Texas Workforce Solutions office in El Paso, Texas to obtain more information about the job.

5.36     The Texas Workforce Commission is the designated SWA in Texas.  Texas Workforce Solutions is a statewide network comprised of the Texas Workforce Commission, 28 workforce development boards, and their contracted service providers and community partners.

5.37     Plaintiff JUAN GUZMAN also went in or around early May, 2012 to WKI's headquarters on Lomaland Avenue in El Paso, Texas to inquire about the job.  Plaintiff JUAN

GUZMAN spoke with WKI employee Raul Cortes about the job. Raul Cortes told Plaintiff JUAN GUZMAN that WKI was looking to hire 100 workers, and that he (Plaintiff JUAN GUZMAN) had the job and was among the 100 workers. Raul Cortes gave Plaintiff JUAN GUZMAN a packet of written information on the job. Plaintiff JUAN GUZMAN filled out an application while at the Lomaland headquarters and turned it in to Raul Cortes or another employee of WKI.

5.38    Plaintiff ESTEBAN ALFARO-HUITRON did not receive any written documentation of the job offer or of the contract that he signed with Defendants.

5.39    Various farmworkers, including the El Paso Plaintiffs, accepted the offer conveyed by WKI directly or by its agent(s) at the time of recruitment in El Paso in or around late April and early May 2012, and agreed to work for Defendants under the terms and for the consideration offered by WKI.

5.40    WKI's offer to the El Paso Plaintiffs of work, housing, and transportation according to the terms outlined above, coupled with the El Paso Plaintiffs' acceptance of that offer, created a "working arrangement" within the meaning of AWPA, 29 U.S.C. § 1822(c) between each and every El Paso Plaintiff and each and every Defendant.

5.41    WKI's offer of work to the El Paso Plaintiffs according to the terms outlined above, and the acceptance thereof by the El Paso Plaintiffs, created a contract of employment between each and every El Paso Plaintiff and each and every Defendant.

5.42    The El Paso Plaintiffs ceased looking for other agricultural employment because they had agreed to work for Defendants between June 1 and August 15, 2012 (and some had agreed to work for up to five or six months). Some of the El Paso Plaintiffs left other jobs in order to accept the job offered by Defendants.

**D.  Grower Defendants, WKI, and JAIME CAMPOS Recruited and Hired
Farmworkers, Including the Trejo Family, Through Texas Workforce Solutions**

5.43    In or around early May 2012, the Trejo family went to their local Texas

Workforce Solutions office in Mission, Texas to look for available work in agriculture.

5.44    Workforce Solutions employee Mario Galvan told the Trejo family about WKI's

job offer for work in chiles and onions in southern New Mexico. Mario Galvan gave the Trejo

family documents to sign to accept the offer of employment from WKI, JAIME CAMPOS, and

the Grower Defendants according to the terms in the Clearance Order that WKI filed with DOL.

5.45    WKI's offer to the Trejo family of work, housing, and transportation according to

the terms outlined above, coupled with the Trejo family's acceptance of that offer, created a

"working arrangement" within the meaning of AWPA, 29 U.S.C. § 1822(c) between each and

every Trejo family Plaintiff and each and every Defendant.

5.46    WKI's offer of work to the Trejo family according to the terms outlined above,

and the acceptance thereof by the Trejo family, created a contract of employment between each

and every Trejo family Plaintiff and each and every Defendant.

5.47    The Trejo family ceased looking for other agricultural employment because they

had agreed to work for Defendants between June 1 and August 15, 2012.

5.48    After accepting Defendants' offer of employment, the Trejo family received an

offer from Bravo Labor Agency to work as ranch hands in South Dakota.  They turned down that

offer because they had already agreed to work for Defendants between June 1 and August 15,

2012.

5.49    At the time that Defendants provided information to the Trejo family, Defendants

knew the information they were providing about the terms and conditions of the work and

housing was false and misleading.

5.50    In the alternative, at the time that Defendants provided information to the Trejo family, Defendants made those promises to each of these Plaintiffs recklessly, as positive assertions, and without knowledge of their truth.

**E.  The Department of Labor Informed Defendants that There Were More Than Enough U.S. Workers Able, Willing, Qualified, and Available For the Job at the Time and Place Needed**

5.51    On May 9, 2012, the ETA's National Processing Center in Chicago sent WKI an e-mail notifying Defendants that it had received 108 referrals from the New Mexico SWA and 35 direct referrals from the Texas SWA.  *See Exhibit 4, attached* (Enclosure for Denial Letter, describing e-mail sent on May 9, 2012).

5.52    As of May 18, 2012, the Texas SWA (Texas Workforce Solutions) had referred 42 workers directly to Defendants for employment under the Clearance Order that WKI filed with the U.S. DOL.  *See id.*  The New Mexico SWA had referred 53 workers directly to Defendants, and had provided another 55 workers with information on the Clearance Order, allowing them to contact WKI directly. *Id.*  In total, 150 workers were referred to Defendants to work under the terms of the Clearance Order, far more than the 85 workers requested by Defendants.

**F.  The Grower Defendants, WKI, and JAIME CAMPOS Never Provided the Promised Work in Southern New Mexico, Leaving the El Paso Plaintiffs Without Contracted-For Employment and Wages**

5.53    At a meeting at the BAWC, JAIME CAMPOS or his assistant(s) informed workers, including the El Paso Plaintiffs, to be ready to be picked up by Defendants on a certain date.

5.54    In anticipation of the promised start date, the El Paso Plaintiffs prepared themselves to leave for work and packed their bags.

5.55    Also in anticipation of this start date, Plaintiff JUAN GUZMAN returned to WKI's Lomaland Avenue headquarters on a weekday in or around late May 2012.  No one was there; Plaintiff JUAN GUZMAN observed no preparations being made to house him and the other workers hired by Defendants.

5.56    On the date that JAIME CAMPOS or his assistant(s) had promised to pick up the El Paso Plaintiffs, among other farmworkers, from the BAWC, no one from WKI ever arrived at the BAWC to transport the workers to the housing or work sites.  No Defendant or agent of any Defendant ever contacted the El Paso Plaintiffs to inform them that the job had been canceled.

5.57    On the day that JAIME CAMPOS and other Defendants failed to pick them up, Plaintiffs ISMAEL MARTINEZ and JUAN GUZMAN concluded that Defendants were not coming at all.

5.58    Plaintiff ELEAZAR GARCIA-MATA waited for a few days at the BAWC after the date when JAIME CAMPOS or his assistants had promised and failed to pick them up, without looking for other work, in case Defendants came to pick them up for work.  After waiting for a few days and hearing nothing from Defendants, Plaintiff ELEAZAR GARCIA-MATA concluded that Defendants were not coming at all.

5.59    Plaintiff ESTEBAN ALFARO-HUITRON waited for approximately one week at the BAWC after the date when JAIME CAMPOS or his assistants had promised and failed to pick them up, without looking for other work, in case Defendants came to pick them up for work. After waiting for approximately one week and hearing nothing from Defendants, Plaintiff ESTEBAN ALFARO-HUITRON concluded that Defendants were not coming at all.

5.60    The El Paso Plaintiffs had difficulty obtaining other work after WKI and Defendants unilaterally breached its contract to employ them.  The jobs that the El Paso Plaintiffs eventually found paid less than the job that they accepted from Defendants.

5.61    At the time that Defendants provided information to the El Paso Plaintiffs, Defendants knew the information they were providing about the terms and conditions of the work and housing was false and misleading.

5.62    In the alternative, at the time that Defendants provided information to the El Paso Plaintiffs, Defendants made those promises to each of these Plaintiffs recklessly, as positive assertions, and without knowledge of their truth.

### G.  Grower Defendants, WKI, and JAIME CAMPOS Canceled the Promised Work in Southern New Mexico, Leaving the Trejo Family Plaintiffs Without Contracted-For Employment and Wages

5.63    The Trejo family was prepared to head to El Paso from their homes in the Rio Grande Valley right after they signed the contracts that Texas Workforce Solutions provided.

5.64    Before the Trejo family could leave for El Paso, however, they received a telephone call from JAIME CAMPOS on or around May 22, 2012.  JAIME CAMPOS informed the Trejo family that a storm damaged the chile crop in New Mexico and therefore the job was canceled.

5.65    JAIME CAMPOS also told the Trejo family, during that same phone call, that he was recruiting workers to go to Georgia to work in melons and strawberries, with housing free of charge.  JAIME CAMPOS told the Trejo family that he would telephone them again on or around May 24, 2012, to arrange transportation for them to Georgia.  Neither JAIME CAMPOS nor any other Defendant ever contacted the Trejo family again.

5.66     The Trejo family had difficulty obtaining other work after Defendants unilaterally breached their contract to employ them.

**H.  The U.S. DOL Denied Defendants' Application to Bring In Foreign Workers, and Shortly Thereafter WKI Requested Termination of the Job Order Due to Drought, Which DOL Granted**

5.67     On May 25, 2012, DOL sent Defendants, via their attorney, a letter of denial of their application for temporary labor certification.  *See Exhibit 5, attached*.

5.68     DOL concluded that the Defendants "ha[d] not made a good faith effort to hire all eligible U.S. workers interested in the job opportunity," and "there were sufficient U.S. workers to fill the 85 positions sought by the employer."  *Id.*

5.69     Later that same day, WKI and JAIME CAMPOS, through their attorney, sent a letter to DOL stating that the contracts with the Grower Defendants "necessitated termination based on the farmers' inability to continue with the contracts due to the effects of drought and weather conditions."  *See Exhibit 6, attached*.

5.70     WKI and JAIME CAMPOS attached a letter from Paul H. Gutierrez, an Extension Specialist in the Department of Agricultural Economics and Agricultural Business at New Mexico State University in Las Cruces, New Mexico.  *See Exhibit 7, attached*.  In that letter, Paul Gutierrez wrote that "many farmers, including the farms contracted with WKI Outsourcing Solutions have been forced to cut back on planted acres, particularly vegetable crops."  *Id.*  Paul Gutierrez also wrote that "[o]n Tuesday, May 8, 2012, several farms, including farms contracted with WKI were hit by a hailstorm causing significant damage to crops that were planted, destroying much of the chili, cotton and other vegetable crops that were in the path of the storm."  *Id.*

5.71     On May 29, 2012, DOL requested copies of the terminated contracts in order to process the request for termination due to contract impossibility.  *See Exhibit 6* (e-mail from Chicago National Processing Center to Jose Carbonell).

5.72     On May 30, 2012, Defendants, through their attorney, sent in copies of the Agreements of Outsourcing Support between WKI, SKYLINE, and LACK.  *See Exhibit 8, attached*.

5.73     The amended Agreement of Outsourcing Support between WKI and SKYLINE contains a handwritten note at the bottom.  The left-hand section of the hand-written portion is Marty D. Franzoy's signature, below which he wrote "Cancelled."  The right-hand section is a short statement that reads, "On behalf of Skyline Produce I, Marty Franzoy, cancel agreement for services as of 05/22/2012 due to hailstorm, and adverse conditions."

5.74     The amended Agreement of Outsourcing Support between WKI and LACK also contains a handwritten note at the bottom.  Dated "5/14/2012," the note reads: "Because of poor growing conditions due to lack of surface water, we are experiencing a 40% crop reduction on all rotation; chili, onion, wheat, alfalfa.  With that Lack Farms Inc [*sic*] seeks to cancel this labor agreement.  Thank you, Rosie Lack."

5.75     On May 31, 2012, the ETA's National Processing Center in Chicago granted the Defendants' request for termination of the job order due to "the effects of drought and weather conditions."  *See Exhibit 9, attached*.

**I.    Hail Damage to the Grower Defendants Was Minimal, and the Grower Defendants Were Harvesting Onions with Other Farmworkers Days After Defendants Breached Their Contract with Plaintiffs**

5.76    On or around May 22, 2012, the New Mexico State Monitor Advocate,[2] Irene Laguna, called Marty Franzoy of SKYLINE and Joe Lack of LACK.  *See Exhibit 10* (e-mail attachment).  Marty Franzoy told Irene Laguna that SKYLINE had hail damage to 100 acres of "big onions" and to 60-70 acres of "small onions," but no hail damage to the chile crop.  *See id.* Joe Lack told Irene Laguna that LACK suffered <u>no</u> hail damage to its chiles or onions.  *See id.*

5.77    On or around June 1, 2012, Regional Monitor Advocate Jesus Morales wrote an e-mail to various officials within the ETA and the State Monitor Advocate system, in which he noted that SKYLINE and LACK "are harvesting onions now."  *See id.* (e-mail). According to Jesus Morales's e-mail, SKYLINE and LACK "are harvesting onions with the same crewleaders that have been working for them for many years.  [LACK] had 27 workers in the field, they just started their onion harvest and will be working out there for the next 7-8 weeks according to [Irene Laguna, the New Mexico] SMA."  *Id.*

5.78    Jesus Morales also stated that WKI was "play[ing] the system," canceling jobs at the last minute so that "workers will no longer accept referrals to his jobs because they are not hired and [WKI] then will use this as a reason to bring in H2A workers."  *Id.*

---

[2] National, regional, and state monitor advocates work to ensure that the services provided to migrant and seasonal farmworkers are "'qualitatively equivalent and quantitatively proportionate' to the services provided to other jobseekers."  *See* U.S. Department of Labor, Employment and Training Administration, Migrant and Seasonal Farmworkers Monitor Advocate System, *available at* http://www.doleta.gov/programs/msfw.cfm (last accessed April 1, 2014).

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION: MIGRANT AND SEASONAL AGRICULTURAL WORKER'S PROTECTION ACT (AWPA)
#### (Against All Defendants)

6.1     Plaintiffs reincorporate and reallege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

6.2     Defendants intentionally violated the Plaintiffs' rights under the AWPA by:

      a)     Knowingly providing false and misleading information to the Plaintiffs regarding the terms and conditions of agricultural employment, in violation of 29 U.S.C. § 1821(f); and

      b)     Violating without justification the terms of the "working arrangement" made with Plaintiffs, in violation of 29 U.S.C. § 1822(c).

6.3     Defendants intentionally violated the El Paso Plaintiffs' rights under the AWPA by allowing recruitment by employees who do not possess an FLC registration certificate, issued by the United States Department of Labor, in full force and effect, in violation of 29 U.S.C. § 1811.

6.4     In addition, Defendants intentionally violated Plaintiff ESTEBAN ALFARO-HUITRON's rights under the AWPA by:

      a)     Failing to disclose to the Plaintiffs at the time of recruitment, in writing, the terms and conditions of employment, in violation of 29 U.S.C. § 1821(a); and

      b)     Failing to provide to each Plaintiff the required written disclosures in a language that he could understand (namely, Spanish) at the time of recruitment, in violation of 29 U.S.C. § 1821(g).

6.5    As a direct consequence of Defendants' violations of Plaintiffs' rights under the AWPA, Plaintiffs suffered substantial injury.

6.6    Defendants are liable jointly and severally to Plaintiffs under AWPA for Plaintiffs' actual damages, or in the alternative for statutory damages of up to $500 per worker per violation of AWPA, whichever is greater, pursuant to 29 U.S.C. § 1854.

## SECOND CAUSE OF ACTION: BREACH OF CONTRACT
### (Against All Defendants)

6.7    Plaintiffs reincorporate and reallege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

6.8    In or around late April 2012, Defendants, either directly or by their agent(s), offered employment from June 1 to August 15, 2012, to the El Paso Plaintiffs when those Plaintiffs were recruited and/or solicited in El Paso, Texas.

6.9    Defendants' offer was supported by consideration in that Defendants, either directly or by their agent(s), promised to hire and employ the El Paso Plaintiffs from June 1 to August 15, 2012 (and for longer periods of time, for some) in agricultural employment in chiles and onions for a wage of $9.94 per hour with free housing and free transportation, meals provided at a cost of $11.13 per worker per day, and at least 35 hours per week of work, with a guarantee of three-quarters of the promised work.

6.10    The El Paso Plaintiffs accepted Defendants' offer by signing their names on a list of interested workers, and/or by filling out job applications, and/or by signing contracts provided by Defendants at the time of their recruitment and/or solicitation by Defendant WKI or its agents in El Paso, Texas.

6.11    This created a valid and enforceable contract between Defendants and the El Paso Plaintiffs.

6.12    In or around early May 2012, Defendants, either directly or by their agent(s), offered employment from June 1 to August 15, 2012 to the Trejo family when those Plaintiffs were recruited and/or solicited in Mission, Texas.

6.13    Defendants' offer was supported by consideration in that Defendants, either directly or by their agent(s), promised to hire and employ the Trejo family from June 1 to August 15, 2012 in agricultural employment in chiles and onions for a wage of $9.94 per hour with free housing and free transportation, meals provided for $11.13 per day per worker, at least 35 hours per week of work, and a guarantee of three-quarters of the work promised.

6.14    The Trejo family accepted Defendants' offer by signing employment documents provided by the Texas Workforce Solutions office in Mission, Texas.

6.15    This created a valid and enforceable contract between Defendants and the Trejo family.

6.16    Each Plaintiff, at all relevant times, was ready, willing, and able to perform his duties under the contract with Defendants.

6.17    Each Defendant breached the contract of employment into which they entered with each Plaintiff by failing to provide the contracted-for employment and wages and other benefits to each Plaintiff.

6.18    Defendants' breach was material.

6.19    As a direct consequence of Defendants' breach of the employment contract, the Plaintiffs suffered damages and substantial injuries.

6.20    The damages of each Plaintiff, including, but not limited to, injuries and lost wages, were incurred as natural, probable, and foreseeable consequences of Defendants' above-described material breaches of their contract with each Plaintiff.

6.21    Defendants are therefore liable jointly and severally to each Plaintiff for actual, incidental, and consequential damages, and costs under TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 2012).

**THIRD CAUSE OF ACTION: PROMISSORY ESTOPPEL**
**(Against All Defendants)**

6.22    Plaintiffs reincorporate and reallege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

6.23    Acting in reasonable and detrimental reliance on Defendants' promises, either directly or by their agent(s), to provide them with the promised work in agricultural labor from June 1 to August 15, 2012, with free housing and free transportation, at least 35 hours per week of work, and a wage of $9.94 per hour, with a guarantee of three-quarters of the promised work, the Trejo family decided not to accept a job offer from Bravo Labor Agency in South Dakota, stopped looking for other work for that period, and began making plans to travel to the El Paso area to begin work.

6.24    Acting in reasonable and detrimental reliance on Defendants' promises, either directly or by their agent(s), to provide them with the promised work in agricultural labor from June 1 to August 15, 2012, with free housing and free transportation, at least 35 hours per week of work, and a wage of $9.94 per hour, the El Paso Plaintiffs packed up their personal belongings, stopped looking for other work for that period, and left the jobs at which they had been working.

6.25    All Plaintiffs incurred expenses and forewent other opportunities because of their reliance on Defendants' promises, which was to the farmworker Plaintiffs' detriment.

6.26    Plaintiffs' performance served to benefit Defendants.

6.27    Defendants intentionally, either directly or by their agent(s), designed their promises regarding the terms and conditions of the employment arrangement to induce or tacitly encourage the Plaintiffs to reasonably rely on those promises, and to act thereon to their detriment.

6.28    The Plaintiffs' conduct in reliance on Defendants' promises was at all times known to Defendants.

6.29    The Plaintiffs are therefore entitled to recover from Defendants jointly and severally *in quantum meruit*, to compensate the Plaintiffs for services provided and to avoid the unjust enrichment of Defendants.

## VII.    PRAYER FOR RELIEF

7.1    WHEREFORE, Plaintiffs respectfully request that this Court grant them the following relief:

a)    Enter a declaratory judgment that Defendants violated Plaintiffs' rights under the AWPA; that Defendants breached each individual contract with each Plaintiff or, in the alternative, that Defendants are liable to each Plaintiff based on Plaintiffs' promissory estoppel claim; and that Defendants are liable to each Plaintiff based on Plaintiffs' fraud and fraudulent inducement claims as set forth in the preceding paragraphs;

b)    For each AWPA violation by Defendants, award each Plaintiff statutory damages of $500 per violation or, in the alternative, actual damages for each violation, whichever is greater, pursuant to 29 U.S.C. § 1854;

c)  Award Plaintiffs their actual, incidental, and consequential damages resulting from Defendants' breach of contract, and attorney's fees, reasonable expenses, and costs of court; or, in the alternative,

d)  Award Plaintiffs their damages resulting from their reasonable and detrimental reliance on Defendants' promises, and attorney's fees, reasonable expenses, and costs of court;

e)  Award Plaintiffs prejudgment and post-judgment interest, as allowed by law; and

f)  Award Plaintiffs all other relief as this Court deems just and proper.

Respectfully submitted,

TEXAS RIOGRANDE LEGAL AID, INC.
1331 Texas Ave.
El Paso, TX 79901
Telephone: (915) 585-5100
Fax: (915) 544-3789

*/s/ Sarah Rich*
Sarah M. Rich
Texas Bar No. 24085551
Admitted to W.D. Tex.
Email: srich@trla.org
ATTORNEY IN CHARGE FOR
PLAINTIFFS

*/s/ Jerome Wesevich*
Jerome Wesevich
Texas Bar No. 21193250
Admitted to W.D. Tex.
Email: jwesevich@trla.org
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that I will serve process on each Defendant pursuant to the Federal Rules of Civil Procedure, and that I filed the original with the Clerk of Court via online filing with the DCECF system on this the 30th day of April, 2014.

*/s/ Sarah Rich*_____
Sarah M. Rich, Esq.